[No. H031631. Sixth Dist. Aug. 12, 2009.]

DVD COPY CONTROL ASSOCIATION, INC., Plaintiff and Appellant, v. KALEIDESCAPE, INC., Defendant and Respondent.

COUNSEL

Akin Gump Strauss Hauer & Feld, Edward Peter Lazarus, Michael C. Small, L. Rachel Helyar; White & Case, William S. Coats, Heidi L. Keefe, Mark R. Weinstein and Mark F. Lambert for Plaintiff and Appellant.

Mitchell Silberberg & Knupp and Wade Brandon Gentz for The Motion Picture Association of America as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Offices of Richard R. Wiebe, Richard R. Wiebe; Thelen Reid Brown Raysman & Steiner, Keith L. Slenkovich, Tomomi Harkey; The Moore Law Group, Thomas E. Moore III and Nicole V. Economou for Defendant and Respondent.

**OPINION**

**PREMO, J.**—The Content Scramble System (CSS) is the standard technology used to prevent unauthorized copying of movies and other copyrighted content stored on DVD's. Defendant Kaleidescape, Inc. (Kaleidescape), licensed CSS from plaintiff DVD Copy Control Association, Inc. (DVDCCA), in order to develop a home entertainment system for viewing movies distributed on DVD.[1] The system Kaleidescape developed is capable of storing and organizing content from thousands of DVD's. Once stored in the Kaleidescape system, the DVD content may be played back at any time, without the need to reinsert the physical DVD. This feature of the system simplifies the storage and organization of very large DVD collections. It also allows users to make

---

[1] DVD stands for "digital versatile disk." DVD's are commonly used to record full-length movies. (*DVD Copy Control Assn., Inc. v. Bunner* (2004) 116 Cal.App.4th 241, 245 [10 Cal.Rptr.3d 185].)

permanent copies of borrowed or rented DVD's so that a user could amass a sizeable DVD library without purchasing a single DVD.

DVDCCA sued Kaleidescape for breach of contract and breach of the covenant of good faith and fair dealing. DVDCCA alleged, among other things, that, because the Kaleidescape system allowed users to make persistent copies of DVD's and did not require the physical DVD for playback, it did not comply with specifications contained in a document entitled "CSS General Specifications" (General Specifications), which, DVDCCA maintained, was part of the agreement between the parties.

After a court trial, the trial court entered judgment for Kaleidescape. The trial court found that General Specifications was not part of the agreement between the parties because it had not been incorporated by reference into the written agreement Kaleidescape executed (License Agreement). Without reaching the issue of breach, the trial court also held that, even if General Specifications was part of the overall agreement between the parties, its terms were not sufficiently definite to allow for specific performance, and injunctive relief was unavailable because DVDCCA had not shown it would suffer irreparable harm. Since DVDCCA had sought only equitable relief, this ruling deprived it of any remedy.

We shall reverse. We conclude that the mutual intent of the parties at the time the License Agreement was signed was that DVDCCA would grant Kaleidescape permission to use CSS in exchange for the payment of an administrative fee and Kaleidescape's promise to build its system according to specifications that DVDCCA would later provide. This promise is express and complete on the face of the License Agreement. The undisputed extrinsic evidence shows that General Specifications was one set of specifications that DVDCCA provided to Kaleidescape pursuant to this arrangement.

As to the remedy, a specific performance order cannot be crafted unless and until the trial court decides that Kaleidescape is in breach. Resolution of that issue will clarify the meaning of the terms. Further, the License Agreement contains a stipulation that a breach would result in irreparable harm. If Kaleidescape has breached the License Agreement, then the trial court should enforce the stipulation absent a finding that DVDCCA would have had an adequate remedy at law.

We shall reverse the judgment and remand with directions that the trial court determine whether Kaleidescape has breached the License Agreement and, if so, to determine the appropriate remedy.

## I. *Factual Background*

DVD's are convenient media for storage and distribution of motion pictures and other audio and video works. "Unlike motion pictures on videocassettes, motion pictures contained on DVD's may be copied without perceptible loss of video or audio quality. This aspect of the DVD format makes it particularly susceptible to piracy." (*DVD Copy Control Assn., Inc. v. Bunner, supra,* 116 Cal.App.4th at p. 245.) Because of this, the movie studios were reluctant to release movies on DVD absent some system to protect their valuable content. CSS was developed to provide that protection. "Simply put, CSS scrambles the data on the disk and then unscrambles it when the disk is played on a compliant DVD player or computer." (*Ibid.*)

In order to ensure that all DVD devices can play CSS-protected DVD's, the industries involved—entertainment, consumer electronics, and information technology—decided to license CSS to any manufacturer desiring to make DVD equipment or components. Over the course of more than 100 meetings involving negotiations among industry and consumer representatives, the standard License Agreement was adopted. DVDCCA was formed to administer and enforce the license. DVDCCA does not separately negotiate the licenses; the terms and conditions are the same for all licensees. Under the CSS licensing scheme, a licensee identifies the type of device it plans to make by selecting from a list of 14 "membership categories." The licensee promises to maintain the confidentiality of the CSS technology and to adhere to confidential technical specifications that DVDCCA will provide. In exchange for these promises and the payment of an administrative fee, the licensee receives a master key to incorporate into its equipment along with the technical information it needs to utilize CSS. (See *DVD Copy Control Assn., Inc. v. Bunner, supra,* 116 Cal.App.4th at p. 245.)

Kaleidescape wanted to develop a system that could organize very large collections of DVD's and allow the user to view movies in any room of the home. Kaleidescape determined that in order to do this it would have to obtain a license for CSS. Kaleidescape concluded that the type of device it planned to make would fall into the CSS licensing categories of "Video Descrambler" (Descrambler) and "Authenticator Module for CSS Decryption Module" (Authenticator). Accordingly, Kaleidescape executed the License Agreement, paid the administrative fee, and requested technical specifications for Descramblers and Authenticators. DVDCCA then sent Kaleidescape a master key, specifications for Descramblers (Title 609), specifications for Authenticators (Title 809), and General Specifications. Utilizing the specifications DVDCCA had provided, Kaleidescape completed development of its system and shipped it to dealers in August 2003.

The system Kaleidescape developed stores and plays DVD content by means of three components: the reader, the server, and the player. When a DVD is placed in the reader, the reader imports the content from the DVD and an exact copy of the DVD is permanently preserved on the server. The user may then play the content stored on the server without the need to reinsert the DVD. Kaleidescape was careful to design the system to protect the digital signal path between the DVD keys and the player so that the decrypted content could not be pirated. But, because CSS works the same way for all movies on DVD, the Kaleidescape system cannot distinguish between the user's own movies and those the user may have borrowed or rented. Therefore, the reader will import content from any DVD the user inserts, regardless of the source. Although the Kaleidescape system has no physical way to prevent this, the company recognized that this feature of its system would be a problem for content owners and rental businesses. Therefore, Kaleidescape requires all purchasers to sign an agreement by which they promise to import content only from DVD's they own. The system reminds the user of this promise each time it imports a new DVD. After the DVD content is imported and stored, the system displays a "nag screen," which asks the user to confirm that he or she either owns the DVD or will delete it from the server.

When DVDCCA became aware of how the Kaleidescape system functioned, it was concerned that the system did not comply with the pertinent specifications for CSS. In or about December 2003, DVDCCA demanded that Kaleidescape cease manufacturing and selling its system until modifications could be made to bring it into compliance. Kaleidescape representatives met with representatives from DVDCCA in January 2004 but were unable to convince DVDCCA that its system complied with the license requirements. Further attempts to resolve the dispute were unsuccessful. DVDCCA filed this lawsuit on December 7, 2004.

## II. *Pretrial Procedural Background*

By the time of trial, DVDCCA had confined its contract claim to the allegation that Kaleidescape had breached sections 1.5 and 2.1.2 of General Specifications (sections 1.5 and 2.1.2). Section 1.5 stated that CSS "is intended to prevent casual users from the unauthorized copying of copyrighted materials recorded on [DVD's]." Section 2.1.2 described the requirements for playback of DVD content, which, according to DVDCCA, included the requirement that the physical disk be present in the device when the movie is played.

Trial was scheduled to begin on March 19, 2007. Kaleidescape's first trial brief explained that the overall CSS license had five components: the License

Agreement, the "Procedural Specifications," Title 609, Title 809, and General Specifications. The gist of this first brief was that none of these documents prohibited the creation of persistent copies of DVD content or required the physical DVD to be present each time the content is played.

On March 20, 2007, just as the evidentiary phase of the trial was set to begin, Kaleidescape filed a supplemental trial brief entitled, "Lack of Incorporation of CSS General Specifications into the CSS License Agreement." In this brief, Kaleidescape explained: "As part of its review of the DVD CCA's allegations, Kaleidescape has now come to realize that nothing in the CSS License Agreement references and incorporates [General Specifications] into the parties' contract." The brief goes on to argue, apparently for the first time, that General Specifications was not part of the agreement between the parties. On March 27, 2007, Kaleidescape filed a second supplemental brief expanding upon the analysis of the March 20, 2007 brief. Both briefs relied solely upon the language of the licensing documents in arguing that General Specifications was not part of the overall agreement. This new theory did not challenge the applicability of Titles 609 and 809. Indeed, Kaleidescape conceded that it was bound to comply with these specifications.

III. *Trial*

A. *The License Agreement*

The threshold issue for the trial court was whether General Specifications was part of the agreement between the parties. Thus, the court first considered the terms of the License Agreement—the document Kaleidescape executed prior to receiving any of the technical specifications. The License Agreement commenced with the recital: "This CSS LICENSE AGREEMENT (the 'License Agreement'), including the related CSS PROCEDURAL AND TECHNICAL SPECIFICATIONS (together, the 'Specifications') and the Exhibits and Attachments to the License Agreement and Specifications (collectively, this 'Agreement'), is made and entered into by and between [the parties]." The writing stated that the purpose of CSS is "to provide reasonable security for content on DVD Discs and thereby, together with the terms and conditions of this Agreement, to provide protection for such copyrighted content against unauthorized consumer copying . . . ." The license granted was a "worldwide, royalty-free, non-exclusive, nontransferable right . . . [¶] . . . to use and implement CSS to develop, design, manufacture and use DVD Products" in the membership categories selected.

In section 9.5, the parties acknowledged that the movie studios were third party beneficiaries of the License Agreement and that compliance with the terms of the License Agreement "is essential to maintain the integrity and

security of [CSS] and to protect prerecorded motion pictures contained on DVD Discs." Section 10.7 of the License Agreement provided that there could be no modification or waiver of the agreement that "would have a material adverse effect on the integrity or security of CSS" or the third party protections provided under section 9.5. Article 5 of the License Agreement included extensive confidentiality obligations.

A description of the licensing process began in article 3 of the License Agreement, which directed the licensee to choose a membership category, the selection of which told DVDCCA what type of device the licensee planned to make. Section 4.1 of the License Agreement then explained: "Upon Licensee's selection of one or more Membership Categories in accordance with Article 3 and the payment of the appropriate Administration Fee(s), Licensor shall distribute to Licensee the portions of Proprietary Information and/or CSS Specifications appropriate to its Membership Category . . . ." Section 4.2.1 of the License Agreement specified, "Licensee shall comply with the CSS Specifications, as may be amended by Licensor from time to time in accordance with the [DVDCCA] By-Laws. Each DVD Product shall comply with the version of the CSS Specifications which is in effect at the time such DVD Product is manufactured . . . ."

"CSS Specifications" was defined as "the documentation relating to CSS entitled 'CSS Specifications' (including the Procedural Specifications and the Technical Specifications) that Licensor makes available to Licensee, as such documentation may be revised from time to time consistent with Sections 4.2 and 10.7 hereof. Except where otherwise specifically stated, all references to 'CSS Specifications' shall be deemed to include all or any portion of the documentation referenced in the preceding sentence."

Exhibit C to the License Agreement was entitled "CSS Membership Categories and Fee Schedule." Exhibit C listed 14 membership categories, including the Descrambler and Authenticator categories. There were check boxes next to each category for the licensee to indicate which of the membership categories it was requesting. Beneath the list of categories was a list of "Technical Specifications Titles" and the note: "To obtain a Specification from DVD CCA, licensee (or potential licensee) must have a fully executed CSS License . . . ." There followed a list of seven titles corresponding to the membership categories for which technical specifications were available, with check boxes for the titles and number of copies requested. Titles 609 and 809 were listed. General Specifications was not.

B. *Extrinsic Evidence*

1. *Kaleidescape's Evidence*

The trial court admitted all extrinsic evidence in support of the parties' respective interpretations of the License Agreement. Kaleidescape's evidence focused upon the language of the documents. Kaleidescape's founders explained that, prior to entering into the License Agreement, they had consulted the DVDCCA Web site where they found two publicly available licensing documents: the License Agreement and a document entitled "CSS Specifications." The latter document contained two parts: "Procedural Specifications," and "Technical Specifications." Procedural Specifications was a lengthy description of the licensee's obligations. Technical Specifications was a single page stating, "Technical Specifications are provided to Licensee based on Licensee's membership in one or more of the following categories. Licensee receives only those portions applicable to the categories for which it is a member." There followed a list of seven membership categories, which included the Descrambler and Authenticator categories. Kaleidescape signed the License Agreement, paid the administrative fees, and, using the order form in exhibit C, requested Titles 609 and 809, the technical specifications for the Descrambler and Authenticator categories. It did not request General Specifications because General Specifications was not listed anywhere in the publicly available documents.

After receiving the three sets of specifications—Title 609, Title 809, and General Specifications—Kaleidescape set to work to interpret them and build its system. Several Kaleidescape witnesses commented upon how difficult the license was to interpret and how they were unable to obtain any help from DVDCCA. Daniel Collens, one of Kaleidescape's founders, and Stephen Watson, Kaleidescape's chief technology officer, both testified to their understanding that only Titles 609 and 809 applied to the Kaleidescape system. Collens examined the specifications to determine whether they imposed any limitations that had not been apparent from the publicly available documents "that would prevent Kaleidescape from manufacturing and selling the types of products it was considering building." He explained, "What I settled on based on my training in mathematics and logic was, okay, what's the document that we executed . . . and then I worked through the very different areas and clauses of that agreement to find out what rights and obligations they—they expressed. [¶] And that's what led me through these references to the CSS specifications. The bulk of the normative language there is in the procedural specification section and then . . . there are references to the technical specifications, and that incorporates the two documents; one for the DVD descrambler and one for the authenticating module." Watson said

that he had "looked very carefully at both the technical specification that applie[d] to Authenticators and the technical specification that applie[d] to descramblers."

Kaleidescape's expert, Daniel Harkins, testified that, because of the way the Kaleidescape system operated, the alleged disk-in-tray requirement of section 2.1.2 did not apply to it.[2] As to section 1.5, which stated that CSS was "intended to prevent casual users from . . . unauthorized copying," Harkins testified that its language was "informative," not "normative." In normative language, "there are typically key words that specify what one must do, what one should do and what one may do. . . . And these guide an implementor to creating a product that would be interoperable with another independent operation." Informative text, on the other hand, "talks about the intent of the normative text or the reasoning that the standards bodies had for writing this normative text. It puts the reader in a certain frame of mind or gives him sufficient context in which to read the normative text." Section 1.5 was informative because, "It specifically talks about the intent of the standard and not necessarily . . . how one would go about implementing that standard. There are no key words in here that would guide an implementor into what he must, should or may do. It merely specifies the reasoning behind having something like the DVD video content scramble system."

## 2. *DVDCCA's Evidence*

DVDCCA's evidence focused upon Kaleidescape's conduct. DVDCCA introduced memoranda, generated prior to Kaleidescape's entering into the License Agreement, which showed that the company had always been concerned with how its system could protect DVD content. Founders' meeting notes from July 2001 asked, "How do we authenticate that the user has legit permanent copy of the movie?" Another note from the same period reflected a similar concern: "Product must be clearly designed to defeat any circumvention of the copy protection functions. Can the PVL [Personal Video Library, an early working name for the Kaleidescape system] be construed as circumventing?" The same note observed that the contemplated system would allow a person to borrow a DVD and import its contents into the Kaleidescape system, creating a permanent copy in the system library "forever." "[T]his becomes a value—loss proposition for content owners and rental businesses because there is no repeat business ever if everyone were to own an HVL [*sic*, probably should be PVL] product. Rental business will die, and retail business will suffer because borrowing once to have a permanent copy forever seems too good to forego for the average consumer." Another

---

[2] Although the expert opinions were offered on the issue of breach, the trial court referred to those opinions in its discussion of the interpretation issue, which is why we include them here.

memo warned that any system that did not use the physical DVD for playback was "not going to cut it" with DVDCCA.

Watson explained at his pretrial deposition that Kaleidescape knew that it would probably have to license CSS in order to build the system it planned. Knowing that it would not be given the technical specifications until after it executed the License Agreement and paid the administrative fee, Kaleidescape went forward, he said, and "chose to risk the possibility that the full CSS License would turn out to be unacceptable to us." He agreed that the company understood prior to entering into the License Agreement "that the license may not have permitted the product [they] were contemplating."

DVDCCA president, John Hoy, acknowledged that General Specifications was not listed as a technical specifications title in the License Agreement or in exhibit C. This, he explained, was because General Specifications, which included the general CSS security requirements, was not optional. It was "intended for use by all [membership] categories that also receive a technical specification." All licensees who selected a membership category that required a specific technical specification, automatically received General Specifications, as well. General Specifications was delivered to Kaleidescape, along with Titles 609 and 809, the master key, and a CSS license certificate, in a single shipment promptly after the license was executed. The three sets of specifications were formatted identically, bore the same version number, and each was designated confidential.

DVDCCA introduced a memo prepared by Watson after Kaleidescape had received the package of specifications but before this dispute arose. The memo, a compliance analysis that Watson transmitted to the founders in June 2003, revealed Watson's understanding that General Specifications was one of the previously undisclosed sets of CSS specifications to which the License Agreement referred.[3] At his deposition, Watson continued to define the pertinent CSS technical specifications as "the general specifications and the specifications for the particular membership categories to which we belong."

DVDCCA's expert, Brian Berg, like Daniel Harkins, rendered an opinion on the issue of breach. Presuming that General Specifications was part of the

---

[3] The memo explained that the Kaleidescape player "might be a CSS Decryption Module if it incorporated the CSS Authentication Algorithm but otherwise would not be." This interpretation, Watson stated, "agrees also with the definition in the CSS General Specifications part of TS [technical specifications]." He noted that the documents were not clear as to whether the CSS Decryption Module and the Authenticator for CSS Decryption Module were two different products but noted that his interpretation was consistent with a figure in the Authenticator Module "and similar figures in the CSS General Specifications of TS, called henceforth TS-GS."

agreement, Berg testified that the Kaleidescape system breached the License Agreement because it allowed casual users to make unauthorized copies of DVD's and to play DVD's from the copy stored on the server rather than from the DVD itself. Berg found the unauthorized-copy prohibition in section 1.5 and the disk-in-tray requirement in section 2.1.2.

## C. The Trial Court's Ruling on CSS General Specifications

The trial court gave a lengthy proposed decision from the bench, beginning: "I conclude that no part of [the License Agreement] specifically calls out in clear words the General Specifications. So it—from the text of [the License Agreement] alone is not part of the contract." The court found that there "was no real ongoing relationship between the parties in their conduct that would give real help to the court related to how they mutually intended to be carried out." The court concluded, "the General Specifications . . . are not part of the contract signed by the parties." By way of clarification, the court added, "The court adopts the analysis of Kaleidescape's trial brief, filed on March 20th of 2007, and the brief . . . filed on March 27, 2007."

The trial court went on to make several findings. "[C]ertainly the testimony of defense witnesses, to the effect the plaintiff asserts, the court does not adopt that interpretation. I saw this as a case in which everyone tried to do discovery in a way to kind of make up for the fact that nobody sat down and met and talked. [¶] And I do adopt and find credible not the claim that the defendant corporation ab initio, or as they say, from the beginning, conspired and planned—I'm somewhat overstating, but not much—the plaintiff's thesis to dodge and weave and violate the terms of the contract. But rather that hard money was put down in an entrepreneurial environment taking a risk, that that risk was enhanced by the fact that they really couldn't get answers in the contract formation process. The documents were delivered and analyzed. And I've heard the testimony of everyone at the defendant who said they tried to analyze it. The court finds it credible."

Prior to reciting its proposed decision, the trial court had summarized the testimony of every witness. The court summarized DVDCCA's expert, Brian Berg, as testifying to his conclusions that "defendant's actions were noncompliant with the terms of what [Berg] understood to be the contract." The court stressed, however, "The court alone interprets the contract. But the court also acts as a fact-finder to determine what was the contract."

As to Kaleidescape's expert, Daniel Harkins, the court stated: "And he testified to his review—he was a designated expert witness as well. And he testified that the General Specifications are informative, not normative. And he talked about what people in his line of work do to take these documents

and apply them, as these people with specialized knowledge do, to apply them to their tasks to carry out their assignments. [¶] And he said that the General Specifications were not the normative documents that people in his line of work use to determine what shall and shall not be done, what may or may not be done, what must or must not be done. Instead they were inspirational, aspirational goals."

Further on, the court made findings with respect to the expert testimony: "I give credit to the—and resolve the conflict in experts not in favor of Brian Berg, but in favor of Daniel Harkins' interpretation. It makes sense that this is a contract that is not touchy feely, but is strong and normative and tells people what their obligations are.

"Especially—and I do find that the—that there is really no conflict. Having resolved it, the court's quite readily able to determine this without resort to [Civil Code section] 1654, but the court does resort to that as well because the lawyers say there's an ambiguity. . . . [¶] . . . [¶] But the plaintiff had every advantage, the resources of the whole industry and three of them to come together. And in a way, it's as if everybody is responsible, but nobody is responsible. . . ."

After briefly discussing the burden of proof the court went on: "The committee of lawyers worked on this. It ultimately was presented for people to take it or not. I assign no weight to the fact that memos were being prepared in Kaleidescape, or Ph.D.'s and math, logic and everything else, MBA's talking about what they could do and not do. None of that really adds to what was in the contract."

In a written addendum filed after the hearing, the trial court adopted the oral statement as its statement of decision with the clarification that, rather than adopting the analysis contained in Kaleidescape's supplemental trial briefs, the court found the analysis to be "persuasive."

Judgment was entered against DVDCCA on the complaint. This appeal followed.[4]

---

[4] Kaleidescape had filed a cross-complaint against DVDCCA. The court granted DVDCCA's motion for nonsuit (Code Civ. Proc., § 581c), entering judgment against Kaleidescape on its cross-complaint.

## IV. Discussion

### A. General Specifications Was Part of the License Agreement

#### 1. Principles of Contract Interpretation and Standards of Review

■ The first issue is whether the trial court erred in concluding that General Specifications was not incorporated by reference into the License Agreement and, therefore, was not binding upon Kaleidescape. As in all contract cases, interpretation of the License Agreement is guided by the principle that it "must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) The parties' intent is ascertained from the language of the contract alone, "if the language is clear and explicit, and does not involve an absurdity." (*Id.*, § 1638.) Extrinsic evidence is admissible to explain the meaning of a contract if "the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641] (*Pacific Gas & E.*).) In order to determine whether the extrinsic evidence is admissible, the trial court first makes "a preliminary consideration of all credible evidence offered to prove the intention of the parties." (*Id.* at pp. 39–40.) "If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' [citations], extrinsic evidence relevant to prove either of such meanings is admissible." (*Id.* at p. 40.)

■ The court must explain the contract "by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647.) Any uncertainty or ambiguity "must be interpreted in the sense in which the promisor [Kaleidescape] believed, at the time of making it, that the promisee [DVDCCA] understood it." (*Id.*, § 1649.) The court may also look to the acts of the parties that show what they believed the contract to mean. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 749, p. 838.) That is, "the construction given [a contract] by the acts and conduct of the parties with knowledge of its terms, and before any controversy has arisen as to its meaning, is admissible on the issue of the parties' intent." (*Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 851 [44 Cal.Rptr.2d 227].) This rule is not limited to the joint conduct of the parties. " 'The practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them. In the litigation that has ensued,

one who is maintaining the same interpretation that is evidenced by the other party's earlier words, and acts, can introduce them to support his contention.' " (*Ibid.*, quoting 3 Corbin on Contracts (1960) § 558, p. 256.)

Our review of the trial court's interpretation of a contract generally presents a question of law for this court to determine anew. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) "The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal. [Citation.] The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict. However, where the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence." (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 [8 Cal.Rptr.3d 649].)

### 2. The Language of the License Agreement

Having independently reviewed the plain language of the License Agreement, we find that it unambiguously grants Kaleidescape a license to use CSS to develop a DVD device in exchange for a number of promises, including Kaleidescape's promise that it would maintain the confidentiality of the CSS technology and that it would comply with the CSS specifications that DVDCCA would provide after Kaleidescape selected a membership category and paid the associated fees. Kaleidescape does not dispute the substance of this interpretation, conceding that Titles 609 and 809 are CSS specifications that DVDCCA made available and by which it is bound. But according to Kaleidescape, it is bound by Titles 609 and 809 only because they were listed in exhibit C and, therefore, were incorporated by reference. Because General Specifications was not mentioned, it was not incorporated. In our view, the incorporation-by-reference doctrine is inapplicable under the circumstances here.

■ The general rule is that the terms of an extrinsic document may be incorporated by reference in a contract so long as (1) the reference is clear and unequivocal, (2) the reference is called to the attention of the other party and he consents thereto, and (3) the terms of the incorporated document are known or easily available to the contracting parties. (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1607–1608 [71 Cal.Rptr.3d 361]; *Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784, 790 [4 Cal.Rptr.3d 179]; *Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54 [67 Cal.Rptr.2d 850].) This rule advances the primary goal of contract interpretation—ascertaining the mutual intent of the parties—in cases where the parties intended to be bound by specific terms

that were not mentioned in the contract. The clear and unequivocal reference to the extrinsic document and the contemporaneous availability of its terms shows that, at the time of contracting, the parties consented to those terms.

In this case, the agreement plainly requires Kaleidescape to comply with technical specifications that would not be disclosed until after the agreement was executed. Whether the document titles were specifically listed in the License Agreement is of little moment when none of the terms contained in them were available at the time the contract was formed. Indeed, Kaleidescape was expressly precluded from discovering any of the specifications until after it executed the License Agreement. In these circumstances, Kaleidescape cannot be said to have consented to the requirements of Title 609 or Title 809 any more than it can be said to have consented to the particular requirements of General Specifications. That is, under the incorporation-by-reference test, *none* of the specifications would be part of the License Agreement. But this result would be directly contrary to the unambiguous intent of the parties as expressed in the License Agreement, which was that the licensee would comply with the specifications that DVDCCA provided *after* the agreement was signed.

Although we find that the written agreement unambiguously required Kaleidescape to comply with undisclosed specifications that DVDCCA would provide after execution of the agreement, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E.*, *supra*, 69 Cal.2d at p. 37.) Accordingly, we now examine the extrinsic evidence to determine whether the agreement is reasonably susceptible of the meaning Kaleidescape urges.

3. *The Extrinsic Evidence Does Not Support Kaleidescape's Interpretation*

The License Agreement states that the licensee is to comply with "documentation relating to CSS entitled 'CSS Specifications.' " Kaleidescape argues that the "CSS Specifications" document, which stated that the licensee "receives only those portions applicable to the categories for which it is a member," implicitly excludes General Specifications. In our view, the limitation imposed by this document is that the licensee would receive technical specifications applicable to its device but would not be given specifications that would allow it to build another type of device. It does not, as Kaleidescape would have it, exclude specifications that are applicable to all DVD devices across the board. That would be absurd. Moreover, even if this language created an ambiguity, the balance of the evidence resolves it.

The overarching and undisputed intent of the License Agreement was to allow Kaleidescape to produce a DVD device utilizing CSS to access DVD content while maintaining the confidentiality of the CSS technology. DVDCCA could not distribute confidential information pertaining to CSS absent Kaleidescape's promise to maintain its confidentiality. Thus, the agreement was made under circumstances that required DVDCCA to withhold the confidential specifications until after Kaleidescape signed the confidentiality provisions contained in the License Agreement. Both parties understood that technical specifications would be provided after the License Agreement was executed. Kaleidescape knew that it was taking a risk that the undisclosed specifications might preclude the type of device it planned to make. All three sets of specifications, identically formatted, were delivered together, along with the master key, promptly after the agreement was executed, indicating that General Specifications was one set of CSS specifications that DVDCCA was providing pursuant to the License Agreement.

■ Watson's compliance memorandum supports this interpretation because it shows that Kaleidescape always understood that General Specifications was included among the undisclosed specifications to which the License Agreement referred. Indeed, it was not until trial was set to begin that Kaleidescape suggested otherwise. Collens's trial testimony, which Kaleidescape has stressed as the primary evidence supporting its interpretation, does not prove otherwise. Collens testified that based on his experience interpreting technical licenses, it was his belief that only the specifications contained in Titles 609 and 809 applied to the Kaleidescape system. Insofar as the testimony relates to the issue of breach, we express no opinion. But to the extent Collens's opinion was that the License Agreement did not "incorporate" General Specifications, as the trial court recognized, a witness is incompetent to give an opinion on the meaning of the contract language. (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439 [204 Cal.Rptr. 435, 682 P.2d 1100] [interpretation of written contract solely a judicial function unless the interpretation turns upon the credibility of extrinsic evidence].)

The underlying concern in Kaleidescape's argument is that Kaleidescape should not be bound by terms contained in a "secret" document. Indeed, a good part of the trial court's statement of decision reflected a concern that the agreement had not been individually negotiated and was available only on a take-it-or-leave-it basis. Although the court shied away from finding the contract to be one of adhesion, the court seemed to find the agreement to be unfair to Kaleidescape.

■ The License Agreement is a contract of adhesion in that it is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to

adhere to the contract or reject it." (*Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) But such a contract is fully enforceable according to its terms "unless certain other factors are present which, under established legal rules—legislative or judicial—operate to render it otherwise." (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820 [171 Cal.Rptr. 604, 623 P.2d 165], fn. omitted.) To be sure, standardized licenses offered on a take-it-or-leave-it basis are not at all uncommon and have numerous commercial benefits. (See, e.g., *ProCD, Inc. v. Zeidenberg* (7th Cir. 1996) 86 F.3d 1447, 1450–1452 [for Judge Easterbrook's discussion of why shrink-wrap software licenses are enforceable].)

Kaleidescape's argument that it ought not be bound by secret terms is akin to arguing that the terms were not consistent with its reasonable expectations, one of the judicial limitations upon enforcing contracts of adhesion. (*Graham v. Scissor-Tail, Inc., supra,* 28 Cal.3d at p. 820.) But Kaleidescape actually anticipated the requirements of sections 1.5 and 2.1.2 in its prelicensing discussions. Watson admitted that Kaleidescape understood that the undisclosed specifications might prohibit the type of system the founders had in mind. One adviser even warned that the license would probably include a disk-in-tray requirement. Furthermore, the requirements of General Specifications were no more secret than were the requirements of Titles 609 and 809, by which Kaleidescape is admittedly bound. Thus, although the contract was adhesive in that Kaleidescape had to agree to its terms if it wanted to license CSS, the requirements contained in General Specifications did not fall outside Kaleidescape's reasonable expectations.

One reason the trial court might have been concerned with whether the license was unfairly adhesive would have been to decide how forcefully to apply the doctrine of *contra proferentem*—the rule that unresolved ambiguities in a contract are to be interpreted against the drafter. (Civ. Code, § 1654; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 801 [79 Cal.Rptr.2d 273].) Since we find the extrinsic evidence resolves any ambiguity in the contract language, application of that rule is beside the point.[5]

Kaleidescape argues that, as to the extrinsic evidence, we are bound by the trial court's findings. We do defer to the trial court's resolution of factual conflicts if there is substantial evidence to support them. (*Parsons v. Bristol Development Co., supra,* 62 Cal.2d at p. 866, fn. 2.) But in this case, the trial court's findings either did not relate to the interpretation issue or did not resolve factual disputes. For example, the trial court found "credible," the testimony of Kaleidescape witnesses who stated that they tried to analyze the

---

[5] DVDCCA and amicus curiae argue that, in the case of uniform licensing agreements such as this one, ambiguities ought not to be interpreted against the drafter. In light of our resolution of the issue, this is not an argument we need to consider.

contract documents. This finding might have related to the breach of covenant cause of action. For our purposes, the point is immaterial.

The trial court also accepted the testimony of Daniel Harkins and rejected that of Brian Berg. But analysis of the statement of decision shows that this finding did not resolve a factual conflict. Berg presumed that General Specifications was part of the License Agreement and determined that the Kaleidescape system was not compliant with sections 1.5 and 2.1.2. Harkins testified that section 1.5 was "informative," implying that informative language is not binding. As to section 2.1.2, Harkins explained that its requirements were inapplicable to the Kaleidescape system because the system did not fit either category of DVD device described by that section. The factual conflict inherent in the foregoing is whether the Kaleidescape system breached the requirements of section 1.5 or 2.1.2. The trial court never reached the issue of breach and, therefore, did not resolve this conflict. Rather, the trial court relied upon Harkins's testimony about the character of the language to conclude that General Specifications was not part of the agreement at all.

Apparently misremembering that Harkins's opinion about the character of the language was directed to only section 1.5, the trial court concluded that the whole of General Specifications was "informative," explaining, "It makes sense that this is a contract that is not touchy feely, but is strong and normative and tells people what their obligations are." Thus, the court's "finding" was that the language of General Specifications was too vague to guide conduct effectively and, therefore, could not be part of a contract that "tells people what their obligations are." Since there was no dispute about the character of the language, the court's conclusion is not a factual finding by which we are bound. (*Parsons v. Bristol Development Co., supra,* 62 Cal.2d at p. 866, fn. 2.)

In our view, Harkins's opinion about the character of the language of section 1.5 has no bearing upon whether or not Kaleidescape had promised to abide by the requirements. The crucial statement contained in section 1.5 is that CSS was "intended to prevent casual users from the unauthorized copying of copyrighted materials recorded on [DVD's]." This sentence does not tell the licensee *how* to do that but it does express the overall intent, which, as Harkins also explained, can be used to interpret some of the more "normative" language in the agreement. In fact, the License Agreement itself contains almost the identical statement, namely that the purpose of CSS is "to provide protection for such copyrighted content against unauthorized consumer copying." In short, Harkins's testimony does not support the trial court's conclusion that General Specifications was not part of the License Agreement.

We also note that the court gave "no weight" to the evidence of Kaleidescape's internal memoranda, finding that it did not add to what was in the contract. Some of those memoranda were generated before the contract was formed and, as to them, we agree that they do not reflect the mutual intent of the parties at the time of formation. However, to the extent the court's assessment encompassed Watson's compliance memorandum, we are not bound to accept it. Watson's memo shows that after the agreement was executed, he understood General Specifications to be one of the previously undisclosed CSS technical specifications that DVDCCA had provided pursuant to the License Agreement. That evidence was admissible to show Kaleidescape's practical interpretation of the agreement. (*Southern Cal. Edison Co. v. Superior Court, supra*, 37 Cal.App.4th at p. 851.) There was no dispute that the memo was genuine. Thus, the trial court's assessment of it did not resolve a factual conflict. Since there is no factual conflict, we are entitled to give the evidence whatever weight we believe it deserves. (*Parsons v. Bristol Development Co., supra*, 62 Cal.2d at p. 866, fn. 2.)

### 4. *Conclusion*

We conclude that, under the License Agreement, Kaleidescape promised to comply with the technical specifications pertaining to CSS that DVDCCA would provide. General Specifications falls within the scope of that promise and, therefore, Kaleidescape is obligated to comply with its requirements insofar as they are pertinent to its system. Our holding should not be read as interpreting the precise requirements of General Specifications or whether they actually apply to the Kaleidescape system. That is part of the breach analysis upon which we express no opinion.

### B. *Equitable Relief Is Not Precluded*

### 1. *Specific Performance*

Prior to trial, DVDCCA abandoned any claim for damages and sought only specific performance or a permanent injunction. In rejecting the possibility of specific performance, the trial court stated: "[S]pecific performance cannot be granted unless the terms of the contract are sufficiently definite for the court to know what to enforce. . . . [¶] It's not definite to me." This ruling involves an interpretation of the contract language and, therefore, is subject to our independent review on appeal. (*Okun v. Morton* (1988) 203 Cal.App.3d 805, 816 [250 Cal.Rptr. 220].)

### i. *Section 1.5*

■ Section 1.5 stated that CSS was "intended to prevent casual users from the unauthorized copying of copyrighted materials recorded on

[DVD's]." The "informative" character of the language does not preclude a specific performance order as Kaleidescape maintains. As comments to the Restatement Second of Contracts note, "Before concluding that the required certainty is lacking, however, a court will avail itself of all of the usual aids in determining the scope of the agreement. . . . Apparent difficulties of enforcement due to uncertainty may disappear in the light of courageous common sense. Expressions that at first appear incomplete may not appear so after resort to usage [citation] or the addition of a term supplied by law [citation]. A contract is not too uncertain merely because a promisor is given a choice of performing in several ways, whether expressed as alternative performances or otherwise. He may be ordered to make the choice and to perform accordingly, and, if he fails to make the choice, the court may choose for him and order specific performance." (Rest.2d Contracts, § 362, com. b, p. 179, citation omitted.)

In stating the intent of the CSS technology, section 1.5 sets forth a standard by which Kaleidescape's performance under the agreement can be measured. Although the parties disagree about what that standard requires, that dispute is for the trial court to resolve when it rules upon the question of whether Kaleidescape has breached this section. Once it does that, any uncertainty should disappear.

ii. *Section 2.1.2*

Section 2.1.2 describes the playback process for two types of playback devices, a "DVD-Video Player," such as the stand-alone device one would connect to a television set, and a combination DVD-Video DVD Drive and DVD-Video CSS Decryption (Drive plus Decryption) Module. This type of device was identified by DVDCCA witnesses as one that plays DVD content in a computer environment. In pertinent part, the portion of section 2.1.2 that describes the DVD playback system reads as follows:

"For playback by a DVD-Video Player (stand-alone device), the decryption/descrambling process is accomplished through the following process:

"(1) Disc Key Recovery logic in the DVD-Video Descrambler reads Secured Disc Key data from the hidden Lead-in Area [on the DVD] and recovers the Video Disc Key.

"(2) The DVD-Video Descrambler then reads (decrypts) the Encrypted Video Title Key from the hidden Sector Header [on the DVD].

"(3) The DVD-Video Descrambler then descrambles the A/V data in real time for playback.

"Note: The DVD-Video Player is expected to have decryption capability.

"For playback by a [Drive plus Decryption] Module, the decryption/descrambling process is the same as the stand-alone players except for an additional step prior to the actual descrambling."

For our purposes, the extrinsic evidence pertaining to this section is not in conflict. DVDCCA's expert, Alan Berg, explained that this section requires playback by reading the video title key and the video disk key that are contained in the hidden areas in the physical DVD. That is, playback under section 2.1.2 requires the DVD to be physically present in the playback device. Berg said that the Kaleidescape system was a Drive plus Decryption type of device. It was his opinion that, since the Kaleidescape system did not perform playback in the manner described in this section, it did not comply with the contract. Harkins's only disagreement with Berg's analysis was with his opinion that the Kaleidescape system fell into the Drive plus Decryption category. Harkins opined that the Kaleidescape system did not fall into either category of device covered by section 2.1.2. Harkins maintained that the Kaleidescape system was not a player because it used authenticator functionality and the license documents do not define a player as using authenticator functionality. And it was not a Drive plus Decryption module because a decryption module, as defined, receives, decrypts, and descrambles transmissions from a DVD drive, whereas the Kaleidescape system decrypted and descrambled the data from its own server. Thus, according to Harkins, section 2.1.2 did not apply to the Kaleidescape system. He expressed no opinion on what the section required of devices to which it did apply.

Kaleidescape maintains that, since the court accepted Daniel Harkins's testimony, and since Harkins testified that section 2.1.2 did not apply to the Kaleidescape system, the court implicitly adopted the same view. But a finding that section 2.1.2 did not apply to Kaleidescape for the technical reasons Harkins discussed would be dispositive of the question of whether Kaleidescape had breached that section, and the trial court did not reach the issue of breach. The court's summary of Harkins's testimony and its conclusions pertaining to it are set forth in full in part III.C., above. This material demonstrates that the trial court accepted Harkins's testimony only to the extent it pertained to the character of the language. There is no indication that the trial court accepted his conclusion that section 2.1.2 was inapplicable to the Kaleidescape system for technical reasons.

In short, if section 2.1.2 applies to the Kaleidescape system, a question that is not before us and upon which the trial court did not rule, then section 2.1.2, as clarified by the undisputed extrinsic evidence, is not so vague that the court cannot tell what it requires—it requires that playback of DVD content by a Drive plus Decryption device be performed utilizing the physical DVD.

## 2. *Permanent Injunction*

### i. *Standard of Review*

The trial court held that DVDCCA would not be entitled to a permanent injunction because it had suffered no irreparable harm. The conclusion is not supported by the record.

"A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate." (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646 [4 Cal.Rptr.2d 689].) "Although a decision whether to issue, and how to phrase, a permanent injunction is essentially discretionary (cf., e.g., *Feminist Women's Health Center v. Blythe* [(1993)] 17 Cal.App.4th [1543,] 1554–1555 [22 Cal.Rptr.2d 184]), the trial court's discretion is by no means as broad as that which it might exercise in weighing the equities of the parties' positions for the purpose of deciding whether to issue a *preliminary* injunction or other provisional relief. 'A permanent injunction is very different from a pendente lite injunction. . . .' (*Art Movers, Inc. v. [Ni] West, Inc.,* [*supra,*] 3 Cal.App.4th 640, 646 . . . .) Like any judgment, a permanent injunction, notwithstanding its discretionary component, must be sufficiently supported by the evidence of record. (*Ibid.;* cf. also *Richards v. Dower* (1883) 64 Cal. 62, 64 [28 P. 113].) If the evidence is insufficient to justify issuance of a permanent injunction, the trial court simply had no discretion to exercise." (*Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1041 [34 Cal.Rptr.2d 108], citation omitted.)

Review of the instant ruling, however, does not involve a simple sufficiency of the evidence analysis because the trial court concluded that the evidence was *insufficient* to prove the element of irreparable harm. Where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court is, does the evidence compel a finding in favor of the appellant as a matter of law? (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570–571 [150 P.2d 422]; *Caron v. Andrew* (1955) 133 Cal.App.2d 402, 409 [284 P.2d 544].)

 In order to better understand the standard and scope of our review, it is important to understand just what the law means by "irreparable harm." It is common to speak of the need to show threatened irreparable harm as the basis for an injunction. (6 Witkin, Cal. Procedure (5th ed. 2008) Provisional Remedies, § 295, p. 236.) But the concept of irreparable harm means more than harm that cannot be repaired. Irreparable harm includes " 'that species of damages, *whether great or small, that ought not to be submitted to on the one hand or inflicted on the other.*' . . . [Citation.] . . . 'The argument that there is

no "irreparable damage," would not be so often used by [defendants] if they would take the trouble to observe that the word "irreparable" is a very unhappily chosen one, used in expressing the rule that an injunction may issue to prevent wrongs . . . which occasion damages estimable only by conjecture and not by any accurate standard.' " (*Wind v. Herbert* (1960) 186 Cal.App.2d 276, 285 [8 Cal.Rptr. 817], citation omitted.) Irreparable harm may be established where there is the fact of an injury, such as that arising from a breach of contract, but where there is an inability to ascertain the amount of damage. In other words, to say that the harm is irreparable is simply another way of saying that pecuniary compensation would not afford adequate relief or that it would be extremely difficult to ascertain the amount that would afford adequate relief. (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1167 [42 Cal.Rptr.3d 191]; Civ. Code, § 3422.)

■ Civil Code section 3422, which is the statutory basis for a permanent injunction to prevent the breach of an obligation, does not even mention "irreparable harm." As pertinent here, Civil Code section 3422 provides: "[A] final injunction may be granted to prevent the breach of an obligation existing in favor of the applicant: [¶] 1. Where pecuniary compensation would not afford adequate relief; [¶] 2. Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief; [¶] [or] 3. Where the restraint is necessary to prevent a multiplicity of judicial proceedings . . . ." The first two grounds "embody the requirement that to obtain an injunction a plaintiff ordinarily must show that the defendant's wrongful acts threaten to cause irreparable injury, meaning injury that cannot adequately be compensated in damages." (*Syngenta Crop Protection, Inc. v. Helliker, supra*, 138 Cal.App.4th at p. 1167.)

Thus, when the trial court held that DVDCCA was not entitled to injunctive relief because it had suffered no irreparable harm, the court implicitly concluded that DVDCCA had failed to prove that pecuniary compensation would be inadequate or extremely difficult to calculate. Our job is to determine whether uncontroverted and unimpeached evidence compels a contrary conclusion.

ii. *Evidence Pertaining to Irreparable Harm*

The primary harm DVDCCA alleged it would suffer was the harm that would arise from an unaddressed breach of the License Agreement. According to DVDCCA, if it were unable to obtain relief for a breach of the agreement, the entertainment industry would lose confidence in CSS as a content protection mechanism and would limit its release of content in the DVD format. DVDCCA witnesses testified that, "to the extent the breaches remain unaddressed and the rules become progressively degraded and ignored, then the confidence of the content owner is lost. . . . And as a result of

this, less content appears or appears later into the system." Money damages would not compensate for the "erosion of trust and confidence" in the copy protection system. A witness connected to the consumer electronics industry explained, "Consumer electronics companies have no business without content. If content companies perceive that there is no way to protect their content, then my concern is that that begins to erode the overall market for DVD and could potentially damage the entire marketplace for it."

The movie industry already suffers significant monetary losses as the result of unauthorized movie copying with unlicensed devices. One witness worried that the Kaleidescape system, which at the time of trial sold for approximately $10,000, would eventually be reproduced inexpensively, thereby increasing its potential for generating yet more unauthorized copies.

Kaleidescape offered no contradictory testimony other than to establish that the movie industry had not yet suffered any presently calculable harm from unauthorized copying by Kaleidescape users. There had been a small handful of Kaleidescape dealers who had attempted to import rented DVD's into their Kaleidescape systems. One Kaleidescape executive had done the same thing. But there was no evidence that the Kaleidescape system was contributing to widespread unauthorized copying. Jane Sunderland, a DVDCCA board member, acknowledged that there are other products available, such as DVD rippers, that can make unauthorized copies of DVD's, but these products have not undermined trust in the CSS licensing arrangement because they are "rogue tools" and are "illegal" in this country.

iii. *The Contractual Stipulation*

In addition to testimony concerning the potential for harm, section 9.2 of the License Agreement contained the recitation: "[D]ue to the unique nature of certain provisions hereof and the lasting effect of and harm from a breach of such provisions, including making available the means for widespread unauthorized copying of copyrighted content intended to be protected using CSS, in the event that Licensee breaches its obligations . . . , money damages alone will not adequately compensate an injured party . . . [and,] upon showing to the relevant court's satisfaction that applicable factors other than the fact that harm will be irreparable and that monetary damages are not sufficient to remedy the injury have been fulfilled, will be entitled to specific performance or other temporary, preliminary, or permanent injunctive relief including corrective actions appropriate to the circumstances for the enforcement of any such obligations (whether or not there have been commercial sales of products subject to the requested relief)."

iv. *The Statement of Decision*

The trial court held that the stipulation contained in section 9.2 of the License Agreement was not binding: "It seems to me . . . that the great modern trend and the majority rule seems to be, that the parties cannot control the sound exercise of jurisdiction by the trial court acting in equity. [¶] And that means that I would consider [section 9.2 of the License Agreement] in light of all the facts and circumstances." The court went on: "I did not find persuasive the claim of irreparable harm. . . . And [Sunderland's] statement can be fairly read, [to] offer an opinion that it's possibly true that these rogues out there who do all sorts of pirating, have not adversely impacted this contractual arrangement and have not hurt the plaintiff for the reasons that she said. [¶] . . . [A]ssuming that she offered an opinion that any breach would [cause] irreparabl[e] harm [to] the plaintiff, as others did testify to, . . . I credit that as being the sincere belief of those parties not controlling on the court. [¶] And balancing—it seems to me that essentially every witness said, these are the bad things that will certainly happen. And I believe that I'm entitled to take into account those bad things that have not been—have not been demonstrated to have occurred in the several years since this dispute arose. . . . [¶] And I have not been satisfied that there is irreparable harm or at this point any demonstrated harm."

The court further found, "That to the extent the court is permitted to balance hardship, it does appear that there would be a great hardship overcoming any claim of harm that would befall the defendant corporation and its employees. [¶] I credit [Kaleidescape's] opinion that the corporate—corporation would be dramatically scaled back. . . . [¶] It all fits in . . . evaluating this very broadly, my determination that there has been no showing of bad faith by the defendant or any of its representatives. And obviously, if that were a different finding, it could have led to a different result.

". . . The product was the contract. And I believe that the defendant was able and permitted, never having gotten a voice with anybody, to read the contract, rely upon it, and what it said. [¶] Equities are strongly in favor—in contract interpretation issues are strongly in favor of the defense and against the plaintiff on that issue.

"There wasn't a lot of testimony on this, but it does—from what I have heard and everything that I've heard in this case, there is nothing that I heard that suggests that the public interest is adversely affected by honoring this contract as interpreted. And I've really heard nothing here that would equate in this trial the conduct of Kaleidescape and its agents and employees with rogues or pirates."

After commenting on several issues not pertinent to this appeal, the court then stated, "And it really seems to me that much of this dispute, at least based on the evidence presented here, is at present more in the nature of an academic inquiry than any demonstration of actual harm."

v. *Analysis*

Notwithstanding the trial court's discussion of the issues of good faith and contract interpretation, the court's decision on the remedy necessarily presumed that Kaleidescape had breached the License Agreement. The issue, therefore, was whether DVDCCA would suffer irreparable injury in the absence of a permanent injunction preventing further breach. One crucial bit of information before the trial court was the contractual stipulation found at section 9.2 of the License Agreement. Since there is no published California case holding that such stipulations are enforceable, DVDCCA argues that we should treat the stipulation as we would a liquidated damages clause or a consent decree. We agree that this is the prudent approach. But it does not obviate the need to consider the rest of the evidence.

■ Section 9.2 of the License Agreement is an unambiguous recitation of the parties' intent pertaining to the remedy for a breach. The court may not remake the bargain to the advantage of one party for no reason other than that the party has become dissatisfied with the agreement. To do so, "strays from the judicial restraint essential to a rational judicial process." (*In re Marriage of Harbach* (1987) 195 Cal.App.3d 629, 636 [240 Cal.Rptr. 698] (dis. opn. of Wiener, Acting P. J.).) On the other hand, no private agreement is ever binding on the court. For example, consent decrees and stipulated judgments are privately negotiated remedies. (*Firefighters v. Cleveland* (1986) 478 U.S. 501, 519 [92 L.Ed.2d 405, 106 S.Ct. 3063]; *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 664 [268 Cal.Rptr. 284, 788 P.2d 1156].) But courts may refuse to enforce such agreements if they are contrary to public policy or incorporate an erroneous rule of law. (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court, supra,* at p. 664.) " '[T]he court cannot surrender its duty to see that the judgment to be entered is a just one, nor is the court to act as a mere puppet in the matter.' " (*Ibid.,* quoting *City of Los Angeles v. Harper* (1935) 8 Cal.App.2d 552, 555 [48 P.2d 75].)

■ It follows that, as a general matter, where the parties have stipulated to the nature or amount of a remedy, it is proper for the trial court to honor the parties' agreement unless it finds that to do so would be contrary to a rule of law or public policy. The instant stipulation is no exception. In determining the lawfulness of a stipulation that contemplates an equitable remedy, the court should take into account the special nature of equitable remedies. (13

Witkin, Summary of Cal. Law, *supra*, Equity, § 2, p. 283.) Given their extraordinary nature, equitable remedies are usually unavailable where the remedy at law is adequate, as where damages are quantifiable. (*Id.*, § 3, pp. 284–285; *Morrison v. Land* (1915) 169 Cal. 580, 586 [147 P. 259].) That means that a court must reject a stipulation contemplating an equitable remedy that is contrary to law or public policy, such as where the evidence shows that an aggrieved party actually has an adequate remedy at law.[6] Otherwise, the court should honor the parties' agreement and enforce the stipulation.

In the present case, the evidence was that the CSS license helped create the market for movies in the DVD format by reassuring the movie studios that movies released on DVD's could not be easily copied. Industry witnesses testified to their concern that an unaddressed breach of the license would undermine that reassurance and make the movie studios reluctant to release their valuable content on DVD's or release it later in the marketing cycle. The trial court accepted this as the witnesses' honest belief but concluded, in effect, that they were wrong. The court's reasoning on this point is unclear. The trial court determined that DVDCCA was unlikely to suffer any future harm because the "bad things" DVDCCA witnesses feared had not come to pass during the several years of this litigation. But DVDCCA's concern was that the harm would flow from an *unaddressed* breach. The very fact of the litigation showed that DVDCCA was attempting to enforce the License Agreement. At the time of trial, there was no unaddressed breach.

The trial court also opined that, since existing illegal devices that permitted unauthorized copies had not yet "impacted the contractual arrangement," the harm with which DVDCCA was concerned would not come to pass. The inference does not follow logically from the premise. The existence of unlicensed devices cannot have undermined the industry's confidence in the CSS licensing arrangement because those are *unlicensed* devices; they are not

[6] The majority of the appellate cases from other jurisdictions cited by the parties handle the issue in just this way. (See *Dominion Video v. Echostar Satellite Corp.* (10th Cir. 2004) 356 F.3d 1256, 1259, 1264 [rejecting preliminary injunction based upon contractual stipulation where district court had rejected all the plaintiff's evidence of actual harm and found that damages could be quantified]; *Smith, Bucklin & Associates, Inc. v. Sonntag* (D.C. Cir. 1996) 317 U.S. App.D.C. 364 [83 F.3d 476, 478, 481] [contractual provision was "insufficient prop" to support irreparable harm finding where injury could be adequately compensated at law]; *Ed Bertholet & Associates v. Stefanko* (Ind.Ct.App. 1998) 690 N.E.2d 361, 363–364 [contractual provision not binding upon the court where there was no evidence of irreparable harm and affirmative evidence of adequate monetary remedy]; *Ticor Title Ins. Co. v. Cohen* (2d Cir. 1999) 173 F.3d 63, 68–69 [permanent injunction upheld where irreparable harm shown by difficulty in calculating monetary damages and contractual provision stipulating that breach would cause irreparable injury].)

subject to any contractual arrangement. The concern here is with the integrity of the License Agreement. The availability of unlicensed, "rogue tools" is irrelevant to that concern.

The evidence was undisputed that the movie studios had insisted upon some method for preventing unauthorized copying before they would release their movies in the DVD format. The CSS technology, combined with the License Agreement, was the industries' answer to that concern. If Kaleidescape has breached the License Agreement, DVDCCA would be harmed to the extent the breach defeats the overall purpose of the agreement. Only after the trial court determines whether Kaleidescape has breached the agreement can it determine the nature and extent of the harm and whether it could have been remedied in damages. If not, the court should enforce the stipulation by which the parties agreed that a breach of the License Agreement would result in irreparable harm.[7]

## V. *Conclusion*

■ We conclude that the trial court erred in finding that General Specifications was not part of the License Agreement. Accordingly, Kaleidescape was bound by the terms contained in General Specifications, including those contained in sections 1.5 and 2.1.2. The trial court must decide what those terms require and whether Kaleidescape has breached them. On remand, should the trial court conclude that Kaleidescape has breached the License Agreement, the court shall determine the nature and extent of the harm DVDCCA would suffer as a result of a continuing breach and shall determine the appropriate remedy.[8]

## VI. *Disposition*

The judgment is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

Elia, J., concurred.

**RUSHING, P. J.,** Concurring.—I write separately from my esteemed colleagues to make several points. First, I wish to distance myself from any sense of moral opprobrium that may be directed toward Kaleidescape. In my

---

[7] In light of our conclusion, it is unnecessary to consider DVDCCA's challenge to the trial court's balancing analysis.

[8] Kaleidescape submitted a motion to strike portions of the appellant's appendix. We have previously denied the motion without prejudice to its reconsideration in conjunction with our substantive review of the appeal. Since our resolution of the appeal in favor of DVDCCA does not rely upon any of the challenged documents, we shall not disturb our initial ruling.

view, its product was clearly *not* designed or intended to facilitate the theft of intellectual property; nobody buys it for that purpose; and if it has that incidental effect, it is no worse in most respects—and better in others—than an ordinary personal computer with freely available DVD-copying software.

Second, while I agree that the trial court's incorporation-by-reference rationale cannot be sustained even under the rules traditionally governing such an issue, I do not think those rules should apply where, as here, the parties have expressly and advertently agreed that one of them will be bound by terms that, for reasons of commercial security, will only be disclosed after that party has executed the agreement. Under traditional incorporation-by-reference analysis, such after-disclosed requirements could *never* be enforced, because they are never known or available to the licensee until after he has entered the contract. Indeed, Kaleidescape neglects this powerful argument in favor of a more surgical approach only because, I surmise, Kaleidescape recognizes that the traditional rules would prove too much by depriving *all* of the technical restrictions of contractual force. I do not believe we can invalidate all such restrictions without violating our obligation to adapt the law, as far as possible, to existing commercial practices that operate to facilitate fair commerce. For that reason I would hold the traditional rules inapplicable and would articulate guidelines for determining the enforceability of after-disclosed terms of the type at issue here. I would then remand the matter for consideration in light of those guidelines.

### I. *The Kaleidescape System*

As the case comes to us, the only specific restriction that CCA (Copy Control Association) charges Kaleidescape with infringing is what I will call—for convenience, and without prejudging its meaning or effect—the disk-in-machine clause. This appears in the document "CSS General Specifications" (General Specifications) under the general heading "System Architecture," where it is part of the description of "the decryption/descrambling process" as it applies to "playback" by either "a DVD-Video Player (stand-alone device)" or "a combination of the DVD-Video DVD Drive and the DVD-Video CSS Decryption Module." According to CCA, this description contemplates that "playback" will entail the retrieval of data from two physical locations on the original DVD—the "hidden Lead-in Area" and the "hidden Sector Header." The Kaleidescape system does not comply with this requirement, contends CCA, because once a DVD has been imported into the system, its contents may be played back without retrieving any data from the original DVD. This means the content can be displayed (i.e., the movie can be watched) even if the DVD is not physically present. This in turn makes it possible for the system owner to import a movie from a borrowed or rented DVD and then return the original disk to its owner, retaining a persistent copy on his Kaleidescape system.

Whether the disk-in-machine clause is binding on Kaleidescape, and whether Kaleidescape's products comply with that clause, are to me bloodless issues of law. I see no normative valence in this case at all. My colleagues seem troubled by the fact that, as they note early on, the device "allows users to make permanent copies of borrowed or rented DVD's so that a user could amass a sizeable DVD library without purchasing a single DVD." (Maj. opn., *ante*, at pp. 701–702.) That is true, but at least in the context of the disk-in-machine requirement, it strikes me as scarcely relevant. The machine would still violate that clause—assuming it does—even if it could somehow be made to recognize and reject rented or borrowed disks.[1] Indeed it would apparently violate that clause, as construed by CCA, even if it ground the original DVD to powder after storing its contents on the system. The disk-in-machine clause is at most a contract term. It is not a moral imperative.

I recognize that CCA also cites a clause in section 1.5 of the General Specifications ("General Security Requirements"), which states, "The DVD-Video Content Scramble System is intended to prevent casual users from the unauthorized copying of copyrighted materials recorded on DVD-Video/Audio Disks." But on this point I agree with the trial court, and in substance with Kaleidescape's expert Daniel Harkins, who described this language as "informative" rather than "normative." In more familiar legal jargon, it is precatory or advisory rather than operative or prescriptive—a recital rather than a covenant or condition. It *informs* the rest of the contract, furnishing an aid to its construction, but it does not itself prescribe a rule or obligation that the licensee can breach. Even if it is viewed as prescriptive, its vagueness seems to greatly limit its significance. Who is a "casual" user? What is an "unauthorized" copy?

Whatever the meaning of these terms, the Kaleidescape system appears to have no more tendency to permit "casual users" to engage in "unauthorized copying" than the millions of ordinary personal computers (PC's) already found throughout this country and the world. Those devices—available for less than one-twentieth the cost of the least expensive Kaleidescape system— furnish far more powerful tools, if slightly less convenient ones, for bootlegging copyrighted DVD's. For less than $400, a would-be content thief can purchase an ordinary personal computer with a DVD-recording drive—a device now included as standard equipment on nearly all PC's, and available as an add-on component for well under $50. After installing any of a host of

---

[1] Further, so long as the original disk remains in the Kaleidescape owner's possession, the fact that he has placed a copy on the system seems no different in substance from leaving a borrowed or rented DVD in an ordinary DVD player. In the case of rented disks, so long as the owner holds onto the original disk he is presumably paying for the content, either as additional rental fees or by foregoing the opportunity to return the disk to the rental service in exchange for a different title.

widely available software applications (some of them free), the purchaser can load a DVD—his own, a friend's, or a rental service's—and strip away all content protection while "ripping" its contents to his hard drive at a per-disk storage cost, at current hard drive prices, of well under $1. He can then copy the content—now stripped of protection—to any number of recordable DVD's, at a cost, again, of well under $1 per copy. These he can hand out to friends, sell at a flea market, or load into a Kaleidescape-like device, including one that fully complies with the disk-in-machine clause as CCA interprets it.

Indeed an elementary Web search will disclose numerous postings by ordinary consumers who profess to have built, or who express the intent to build, a do-it-yourself Kaleidescape-like system for a tiny fraction of what a real Kaleidescape costs. Unlike the Kaleidescape, these systems will not warn the user against copying DVD's he does not own. They will exact no promise from him not to do so. And, critically, they impose no constraints whatever on the use he makes of the copied content once he has "ripped" it to his system. In this respect the Kaleidescape device affords an important protection that is entirely missing from a home computer, or a media server built around a home computer: The Kaleidescape can make *only the one copy* it needs to operate. It furnishes no way for the user to *further* replicate the content of the DVD, and while its protection system might of course be attacked by a hacker, it was expressly designed to make it "more feasible for an attacker to obtain [encrypted] materials directly from the DVD rather than trying to use a Kaleidescape system to acquire them." As a result, if the user makes a copy of a DVD he does not own, he will make *only* one, and that copy will reside only on his Kaleidescape system—nowhere else. He cannot make a second copy to take with him on vacation, or to his second home, or to load on the Kaleidescape on his yacht. The owner of a $400 computer, in contrast, can not only keep a permanent copy on his hard drive for convenient retrieval but can burn an unlimited number of stand-alone, unprotected copies to dispose of as he sees fit.

The ability of any home computer user to copy Content-Scramble-System-protected DVD content onto a recordable DVD seems to severely reduce the utility of a measure that Kaleidescape considered to further deter unauthorized copies: physically sequestering the source DVD in some kind of vault, thus preventing its use for any other purpose, so long as its content resides on the Kaleidescape server. So far as I can discern, a user could defeat this measure by the simple expedient of first burning a copy of the DVD on his PC, then loading the copy onto the system, returning the original to its owner. It is true that this would add some inconvenience to the process. But that is all it would add to the measures already taken by Kaleidescape to protect the content owner's interests. To achieve that dubious objective, it would inevitably increase the size, cost, and mechanical complexity of the device, and

hence its vulnerability to failure. Indeed in one sense it would magnify the problem for the content owner, because every time the system was circumvented by the method just described, there would be *two* additional copies in existence—one on the server's hard drive and one on the sequestered (perhaps temporarily) duplicate DVD.[2]

In sum, while I acknowledge the literal truth of my colleagues' observation that the device "allows users to make permanent copies of borrowed or rented DVD's" (maj. opn., *ante*, at pp. 701–702), I see little intrinsic significance in that fact beyond its furnishing the genesis for this lawsuit. The same capability has been notoriously available for years to any owner of a computer. Furthermore, it seems plain to me that this is an incidental effect of the system, not its purpose. I doubt that anyone would be so fiscally imprudent as to buy a Kaleidescape system to save money on movies. I doubt even more that anyone that imprudent could ever accumulate the capital to afford it. At current price levels the cost of a Kaleidescape system appears to be *several times* the cost of the DVD's that will fit on it. Internet reports indicate that a recently introduced "mini" system—apparently the least expensive of Kaleidescape's systems—carries a recommended price of $8,000. In its base configuration the device will store the content of 75 DVD's. That means that the purchaser is paying nearly $110 per disk stored—just about 10 times the cost of a typical brandnew DVD. By purchasing additional "mini disk cartridges," the owner can upgrade the system to hold either 225 or 300 DVD's (reports vary). The price of such an upgrade is not readily apparent, but before even considering that factor the system would still cost at least $27 per disk stored—several times what a typical DVD costs.

Obviously, anyone who buys such a system to save money on DVD's is weak on math. The intended purpose of the system has nothing to do with facilitating the unlawful or unsavory acquisition of material the user is not entitled to have and everything to do with exploiting the convenience of data stored in bulk in a digital form. The essential function of the product is to put the owner's movie collection at his fingertips, as he has long been able to do with his music. When he decides to watch a movie, he need no longer leave his easy chair to pore over shelves, or dig through piles, of disks. He need no longer cross to his entertainment system, place the disk in a DVD player, return to his chair, and wait for the disk to load. He need only sit down before his television and browse electronically through his titles until he finds one he wants to watch. Further, he will never have to wonder again where he, or one of his guests or children, mislaid the family copy of Gone with the Wind (Selznick International Pictures 1939). All his movies are securely

---

[2] This last problem might be avoided by another measure Kaleidescape considered, which was to have the device *destroy* the original disk upon loading its content. I find it hard to imagine that such a system would have any significant commercial potential.

stored on a hard drive, waiting to be summoned at the touch of a button. The system also offers the capability of viewing his entire collection all over the house—wherever a satellite "player" is connected to the "server" by a secure Ethernet cable—which means that guests or family members can select and view the movies of their own choice, also at the touch of a button. That, not content theft, is the purpose and selling appeal of the system. It is a high-end system in the category as to which the proverb says, "If you have to ask how much it costs, you can't afford it."

If Kaleidescape had refused to implement some foolproof copy-protection scheme I might feel differently. But there could be no such refusal, because there is no such scheme.[3] Therefore I cannot condemn Kaleidescape for marketing a system that, as an incident of its core function, stores a copy of a DVD's content on a secure hard drive.

## II. Incorporation by Reference

### A. The Trial Court's Ruling

The trial court ruled that the disk-in-machine requirement was not part of the parties' agreement because the document in which it appeared—the "General Specifications"—was not explicitly identified in the license agreement as one of the documents it incorporated by reference. I do not believe this ruling is entitled to appellate deference, because it appears to rest on the documents viewed within their four corners. Thus, in a friendly way I disagree with the trial court's factual premise. Although there is some discrepancy between the description of the binding documents in the license agreement and their actual appearance as supplied to Kaleidescape, that discrepancy is no greater, and in some respects seems slighter, than the

---

[3] The "cracking" of Content Scramble System (CSS) and the encryption system on which it depends was made possible not by some kind of industrial espionage but by reverse-engineering a licensee's software product. (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 871–872 [4 Cal.Rptr.3d 69, 75 P.3d 1]; see Wikipedia, The Free Encyclopedia <http://en.wikipedia.org/wiki/Content_Scramble_System> [as of Aug. 12, 2009]; Wikipedia, *supra*, <http://en.wikipedia.org/wiki/DeCSS> [as of Aug. 12, 2009].) Even without reverse engineering it is possible to "crack" the encryption on a DVD by what is known as a "brute force attack." The system's vulnerabilities are summarized on a cooperative online encyclopedia as follows: "The CSS algorithm was soon revealed to be easily susceptible to a brute force attack . . . . The algorithm's weakness is primarily due to US government crypto-export regulations, which, at the time, forbade the export of cryptosystems employing keys in excess of 40 bits—a key length that had already been proven to be wholly inadequate in the face of increasing processing power . . . . In addition, structural flaws in the algorithm reduced the *effective* key length to only around 16 bits, which could be brute-forced by a 450 MHz processor in less than a minute. As a 450 MHz processor was the stated minimum necessary to decompress a DVD-compliant MPEG-2 videostream in realtime, it effectively meant that any computer that could play a DVD could also crack one." (Wikipedia, *supra*, <http://en.wikipedia.org/wiki/Content_Scramble_System> [as of Aug. 12, 2009], fn. omitted.)

discrepancies concerning two of the other three documents in question. Kaleidescape concedes that all three of the other documents became part of the contract. I find unconvincing its attempt to carve out the General Specifications for different treatment.

As pertinent here, Kaleidescape's central obligation under the license agreement was to "comply with the CSS Specifications."[4] "CSS Specifications" is elsewhere defined as "the documentation relating to CSS *entitled 'CSS Specifications' (including the Procedural Specifications and the Technical Specifications)* that Licensor makes available to Licensee, as such documentation may be revised from time to time consistent with [specified provisions]."[5] (Italics added.)

Read literally, this definition makes a document part of the "CSS Specifications" with which the licensee must comply if it meets three conditions: (1) it relates to CSS; (2) it is "entitled 'CSS Specifications' "; and (3) CCA "makes [it] available" to Kaleidescape. The reference to "the Procedural Specifications and the Technical Specifications" is explicitly non-exclusive, i.e., the CSS Specifications "include" those documents. By strong implication, they may include others.

It appears that the General Specifications was one of four documents that CCA "made available" to Kaleidescape after the latter signed the license agreement and tendered the license fee. Only one of the four—the Procedural Specifications—may be unreservedly said to conform to the description in the license agreement. At the top of the first page is the legend, "Document Version 2.2 (Effective September 15, 2003) [¶] *CSS Specifications* [¶] I. Procedural Specifications." The other three documents bear the following caption/titles:

> DVD-Video Content Scrambling System
> Authenticator Module for CSS Decryption Module
> Version 1.10—November 1, 2000
> [In larger print:] Authenticator Module for CSS Decryption Module

---

[4] "4.2 <u>Compliance with CSS Specifications.</u> [¶] 4.2.1 <u>General.</u> Licensee shall comply with the CSS Specifications, as may be amended by Licensor from time to time in accordance with the By-Laws. Each DVD Product shall comply with the version of the CSS Specifications which is in effect at the time such DVD Product is manufactured, taking into account specific effective date provisions in amendments to the CSS Specifications."

[5] "1.13 '<u>CSS Specifications</u>' shall mean the documentation relating to CSS entitled 'CSS Specifications' (including the Procedural Specifications and the Technical Specifications) that Licensor makes available to Licensee, as such documentation may be revised from time to time consistent with Sections 4.2 and 10.7 hereof. Except where otherwise specifically stated, all references to 'CSS Specifications' shall be deemed to include all or any portion of the documentation referenced in the preceding sentence."

DVD-Video Content Scrambling System:
DVD-Video Descrambler
Version 1.10—November 1, 2000
[In larger print:] DVD-Video Descrambler

DVD-Video Content Scrambling System:
General Specifications
Version 1.10—November 1, 2000
[In larger print:] CSS General Specifications

Kaleidescape views the first two of these documents as embodying the "Technical Specifications" explicitly referred to in the definition of "CSS Specifications." This is a reasonable inference, but they are not so entitled, and nowhere describe themselves as such. Nor do they bear the title "CSS Specifications," or anything like it. They simply do not conform to the definition of "CSS Specifications" as set forth in the license agreement. That they can be identified as such by inference from circumstances I do not question. But the General Specifications require no resort to circumstances, for on their face they conform substantially, if not unmistakably, to the definition of "CSS Specifications" in the license agreement. There is no question that they were "ma[de] available" to Kaleidescape, or that they "relat[e] to CSS." And although their title page does not include the precise phrase "CSS Specifications," it does contain "Content Scrambling System"—the phrase of which "CSS" is an abbreviation—followed by "Specifications," with only the word "General" in between. I see no reason to doubt that those facts are dispositive of the issue whether they were sufficiently "called out" in the contract.

Kaleidescape misses the point, it seems to me, when it asserts that the license agreement "unambiguously excludes the General Specifications document from the scope of the term *'Technical Specifications.'*" (Italics added.) Under the plain terms of the License Agreement, the question is not whether a document falls within the "Technical Specifications," but whether it falls within the "CSS Specifications" with which the licensee agrees to comply. Kaleidescape's argument to the contrary rests on the premise that, as it says, "The 'CSS Specifications' document has two parts: 'I. Procedural Specifications' and 'II. Technical Specifications.'" But this assertion rests on the notion that, by mentioning these particular documents, the License Agreement impliedly *excluded* other documents that might otherwise conform to the definition of "CSS Specifications." I cannot accept his implicit invocation of the maxim *expressio unius exclusio alterius est,* which operates to impliedly exclude unmentioned things when a list of intended things is given. The

mention of the technical and procedural specifications is *explicitly nonexclusive*, i.e., the agreement describes the CSS Specifications as *"including* the Procedural Specifications and the Technical Specifications." (Italics added.)

In sum, it seems plain to me that the General Specifications is "called out" at least as plainly by the license agreement as two of the three documents by which Kaleidescape concedes it is bound. I would therefore reject Kaleidescape's incorporation-by-reference argument on its own terms. As will appear, however, I think the legal principles on which the argument rests, though consistent with existing law, cannot be coherently applied in the present context. A different set of principles must be brought to bear if the law of contracts is to fit itself in a rational and just manner to the commercial realities at work when, as here, a technology license is conditioned on technical restrictions that, by express agreement, will not be disclosed until after the licensee has bound itself to comply with them.

### B. *Commercial Reality*

In my view this case presents a fundamental question of contract law: When, if ever, does a contracting party bind himself to covenants or conditions of which, by mutual agreement, he will be made aware only after he enters into the contract? The traditional answer might have been "Never," because the essence of a contract is an *exchange of promises*, and it is difficult to conceive of someone effectively promising to act (or refrain from acting) in a manner not then known to him.

Indeed, the traditional conditions for incorporating the terms of another document by reference would *categorically forbid* enforcement of a promise to be bound by terms that are withheld until after the contract has been executed. Traditionally, for a document to be successfully incorporated by reference, (1) " ' "the reference must be clear and unequivocal," ' " (2) " ' "the reference must be called to the attention of the other party and he must consent thereto," ' " and (3) " ' "the terms of the incorporated document *must be known or easily available* to the contracting parties." ' " (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54 [67 Cal.Rptr.2d 850], italics added.) The second requirement essentially ensures that the person agreeing to be bound by an external document recognizes and assents to this aspect of his agreement. That requirement, or its equivalent, must and should apply in every case. But the first and third requirements presuppose that the promisor will either actually know what the external document says, or be provided the means to find out, so that he can be charged with knowledge of its contents. Toward that end, the document must be clearly identified and, if not supplied, at least made available for the promisor's inspection.

Obviously the third requirement would operate to completely defeat any attempt to incorporate a document that is actively withheld from the promisor until after the contract has been made. Neither party finds it advisable to acknowledge this point here, but I find it impossible to ignore, like an elephant in the jurisprudential parlor: A straightforward application of the traditional rules here would mean that Kaleidescape was not contractually bound by *any* of the four documents it was given after signing the license agreement.[6]

Kaleidescape's failure to press such a sweeping argument—though it fairly flies off the page of the authorities it cites—is perhaps not difficult to explain. By invalidating the heart of the parties' contract—at least under any theory of contract law—the application of traditional incorporation standards would necessarily cast those standards themselves in doubt. Kaleidescape may have hoped to avoid pulling the temple down around its ears, so to speak, by seeking instead to surgically attack the one document that troubled it on the narrow ground that that one document failed to satisfy just one of the traditional requirements. But this approach seems unworkable from a policy perspective, because the requirement on which it relies becomes an empty, pointless formality without the one it ignores. No description of the incorporated document, however precise and accurate, can charge the promisor with knowledge of what he is agreeing to do if the promisor is barred from reading the described document. Once he agrees to be bound by terms to be disclosed later, what good does it do him to describe in precise detail the document where they are written down? Such a description serves its intended purpose only if it permits him to retrieve, recognize, and *consult* that document before entering the agreement. His ability to recognize it when he sees it is utterly academic if he cannot see it.

Yet application of the traditional rules would unquestionably present great difficulties in some commercial situations where a contracting party may have legitimate business reasons for wishing to withhold certain terms from disclosure until after the other party has bound himself to comply with them. A restaurant franchisor, for example, might quite reasonably balk at disclosing secret recipes to someone who merely professes to be *contemplating* entry into a franchise agreement. Yet he needs some way to ensure that the franchisee will be bound to follow the recipes, lest the franchise name be tarnished. The franchisor might disclose the recipes, prior to contracting, under a separate confidentiality agreement and assurances of the would-be

---

[6] Indeed, Kaleidescape agreed to comply with *future amendments* to the CSS Specifications—an undertaking even more difficult to reconcile with traditional conceptions of contract, and specifically of incorporation by reference. It means that Kaleidescape agreed to be bound by terms that *did not exist yet* and thus were unknown and unknowable not only to it, but to everyone else, including CCA.

franchisee's bona fides. But if the parties wish to structure their relationship by binding the franchisee to comply with recipes before they are disclosed to him, and by requiring a franchise fee as a kind of earnest money, we should think twice before overturning their efforts by adhering uncritically to traditional contract law.

For these reasons the parties' framing of the issue in terms of the clarity with which the license agreement "called out" the General Specifications, and the subordinate arguments about the use of extrinsic evidence and so on to interpret the incorporation clause, strikes me as vaguely off base. If after-disclosed terms of this type are enforceable, then all that can be required prior to their disclosure is that the agreement clearly reflect the promisor's assent to be bound by those as-yet-unknown terms. Vagueness or imprecision in their description may bear on their enforceability, or at least on the remedies available to the promisee. They may furnish grounds for rescission at the behest of the promisor. But it is difficult to see how they can operate to free the promisor entirely from restrictions to which there is no deeper objection than that the document containing them was misdescribed in the document the promisor actually signed. Here Kaleidescape knew and unambiguously agreed, when it decided to enter into the license agreement, that its use of the licensed technology would be subject to a set of technical restrictions that would only be disclosed if and when it bound itself to comply with them. That, it seems to me, is all that mattered at the contract formation stage. If the conditions did not become part of the contract, it must be for a deeper reason than that the unseen document containing them did not, when finally disclosed, exactly match its description in the signed agreement.[7]

The real questions are whether courts should enforce such after-disclosed terms at all, and if so under what conditions. I have little difficulty answering the first question in the affirmative. This is the only answer consistent with our obligation, when confronted with novel commercial transactions, to try as

---

[7] It is of course possible that the promisor in such a case could be prejudiced *after* the terms are supplied if he is reasonably misled by inaccuracies or ambiguities in the signed contract, or by other deficiencies in the promisee's communications with him, as to the nature of the materials communicated. Thus the franchisee in my hypothetical case, if sued over some cooking method alleged by the franchisor not to comply with its after-disclosed recipes, might argue that the franchisor was estopped, at least from securing retrospective relief, by the vagueness with which the asserted obligations were communicated. Whether this would entitle the franchisee to continue its allegedly nonconforming practices indefinitely is quite another question. Since the franchisee agreed to comply with the franchisor's recipes, whatever they might be, a mere delay in understanding what they called for would not seem by itself to justify a permanent exemption from following them. Such an exemption may seem even less defensible in the licensing context, where at least in the realm of federally protected intellectual property interests, licenses are generally interpreted to reserve all rights not expressly granted. (See, e.g., *S.O.S., Inc. v. Payday, Inc.* (9th Cir. 1989) 886 F.2d 1081, 1088 ["copyright licenses are assumed to prohibit any use not authorized"].)

far as possible to conform the law to evolving commercial custom rather than force commercial actors to conform to the preconceptions of judges. Since at least the days of the Hanseatic League, one of the threads running through the law of contracts has been the desirability of accommodating and facilitating fair and efficient commerce. This thread appears perhaps most famously in the first two avowed purposes of the California Uniform Commercial Code, which are "(1) to simplify, clarify, and modernize the law governing commercial transactions," and "(2) to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties." (Cal. U. Com. Code, § 1103, subd. (a)(1)–(2).)

Here the threshold question is whether "custom, usage, and agreement of the parties" militate in favor of the enforcement of technical restrictions such as those embodied, or alleged by CCA to be embodied, in the General Specifications. Certainly the "agreement of the parties" contemplated that Kaleidescape would be bound by a set of technical restrictions even though it would not be told what they were until it had signed the agreement and paid the license fee. The parties have not litigated the questions of custom and usage and it would therefore be rash to opine upon them. However it would hardly be surprising to learn that in license arrangements of this kind, it is common for the licensor to withhold confidential technical restrictions from the would-be licensee until after the licensee binds himself to abide by them. If that is true, I would be extremely reluctant to categorically deprive such provisions of contractual force.

At the same time, by giving effect to such provisions courts will be empowering licensors to sell licensees a pig in a poke, a phrase dating back to an apparently widespread medieval confidence trick. (See Brewer, Dictionary of Phrase and Fable (1898) <http://www.bartleby.com/81/13246.html> [as of Aug. 12, 2009]; Wikipedia, *supra*, <http://en.wikipedia.org/wiki/Pig_in_a_poke> [as of Aug. 12, 2009].) If courts are not to become instruments of sharp practice, we must afford some protection against the situation where the pig turns out to be a cat, which scampers off leaving the licensee holding the bag. (See Brewer; Wikipedia.) As safeguards against such situations, the practice should first be limited to circumstances where a reasonable commercial justification was reasonably apparent to the licensor. This suggests that, in some cases at least, a belatedly disclosed restriction may lose some or all of its contractual force because there was no reason it could not be disclosed prior to the promisor's entry into the agreement. The restriction should also be required to fall within the zone of reasonable expectation from the perspective of the licensee. This criterion might be implicated by an undisclosed restriction unrelated to the subject matter of the agreement, or one that unexpectedly impaired the economic value of the licensed information or technology.

These criteria will have to be fine tuned, and others may have to be articulated, as this area of the law evolves in light of commercial practice and judicial experience. In my view, however, they or something like them should determine whether the General Specifications was contractually binding on Kaleidescape. I would remand the matter to the trial court to consider that question in light of these and similar considerations.

Respondent's petition for review by the Supreme Court was denied October 22, 2009, S176439.