Filed 10/22/14  Wizman v. Elyakim CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JACOB WIZMAN,<br><br>　　　Plaintiff, Cross-defendant and Respondent,<br><br>　　　v.<br><br>MOSHE ELYAKIM,<br><br>　　　Defendant, Cross-complainant and Appellant. | B246897<br><br>(Los Angeles County<br> Super. Ct. No. BC405438) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kevin Brazile, Judge.  Affirmed.

The deRubertis Law Firm, David M. deRubertis and Helen U. Kim; The Rutten Law Firm and Howard Rutten, for Defendant, Cross-complainant and Appellant.

Beitchman & Zekian, David P. Beitchman and Andre Boniadi for Plaintiff, Cross-defendant and Respondent.

_____

Moshe Elyakim appeals from the trial court's judgment that Jacob Wizman's refusal to pay his promissory note to Elyakim did not breach the note. We affirm.

## FACTS AND PROCEEDINGS

Appellant Moshe Elyakim is a general contractor. Respondent Jacob Wizman and appellant were acquainted with each other through construction work appellant had done on respondent's home. Respondent, who is the former president of worldwide sales for Gucci and an original investor in Coffee Bean, has successfully invested in real estate. According to respondent, he had a "good amount of experience, certainly more than the everyday average person with regard to real estate transactions."

In 2004, appellant approached respondent about their investing in two adjacent parcels of undeveloped hillside land in Beverly Hills. Appellant believed he could profitably build several homes on the parcels. Appellant and respondent entered into an oral agreement, under which respondent bought the parcels, one of which was called "Heather Court" and the other "Arrowwood."[1] Respondent paid $1,209,839 for Heather Court and $410,500 for Arrowwood. Because respondent paid the entire purchase price for the parcels, only his name was put on title to the properties, although the parties agreed that they would equally share the project's profits or losses.

After buying Heather Court and Arrowwood, respondent deposited $1.485 million into appellant's personal checking account from which appellant paid the project's construction costs. Construction began on Heather Court, which appellant oversaw as the general contractor and for which respondent paid appellant $10,000 a month. The parties intended to use their profit from the sale of Heather Court to pay for developing the rest of the project.

---

[1]    The settlement agreement that produced the promissory note at the heart of these proceedings refers to the property as "Arrowhead," but the parties' briefs name the property "Arrowwood" (appellant) and "Arrowood" (respondent).

2

The configuration of the Heather Court and Arrowwood hillside lots created ingress and egress challenges to the nearby city street that appellant and respondent had to solve to make the properties fully marketable. A third parcel, called Cedarbrook, lay between Heather Court and Arrowwood and connected them. To solve the access problem, respondent negotiated a lot-line adjustment with Cedarbrook's owner, L&B Real Estate. After negotiating the agreement, L&B Real Estate sold the non-hillside portion of Cedarbrook to Brad Jones. L&B Real Estate conditioned the sale to Jones on his agreeing to honor the lot-line adjustment with respondent by signing a grant deed that transferred the access-strip to respondent. But once L&B Real Estate sold the property to Jones, he refused to honor the agreement to give respondent access.

Respondent assigned to appellant respondent's claims against L&B Real Estate and Jones for breach of the access agreement. In April 2006, appellant filed a complaint against L&B Real Estate and Jones for breach of contract and specific performance. Appellant also recorded a lis pendens on the Cedarbrook property.

In the meantime, appellant and respondent began to have "major differences" on how to proceed with the Heather Court project. As a result, in 2007 appellant stopped construction on Heather Court before it was complete. Appellant's and respondent's relationship having deteriorated to the point that litigation loomed, respondent began negotiating the possible sale of Heather Court and Arrowwood to Mohamed Hadid. Respondent hoped that by selling the properties he would avoid incurring the cost and burden of finishing the project. Respondent's desired sales price to Hadid was $8 million.

Appellant and respondent thereafter began negotiating a global settlement agreement to resolve all of their differences. They met for the first time in September 2007 to discuss settlement. The initial proposal of their tentative settlement was to share the profits from the hoped-for $8 million sale to Hadid. Based on the estimated costs for completing the project, they calculated appellant's half of profits from such a sale would be $2.1 million. In addition, as part of their ongoing settlement negotiations, appellant

3

authorized respondent to negotiate a resolution of the lawsuit against Jones over access to Cedarbrook.

Over the next few months, appellant and respondent prepared several drafts of their written settlement agreement as they continued to negotiate its terms. On January 16, 2008, Hadid submitted to respondent written offers to buy Heather Court and Arrowwood for $8 million. His offers were contingent, however, on his obtaining an access easement on the Cedarbrook property. He proposed closing escrow on January 30, 2008.

Two days after receiving Hadid's offers, respondent settled the Jones' lawsuit. In return for respondent's paying Jones $145,000, Jones agreed to grant an easement on Cedarbrook. On January 18, 2008, respondent delivered a check for $145,000 to Jones.

Five days later on January 23, 2008, appellant and respondent signed a final settlement agreement. Section 3.3 of the settlement agreement obligated respondent to deliver a promissory note to appellant in the amount of $1.685 million. Section 3.3 stated: "[Respondent] shall make and deliver to [appellant] a promissory note in the sum of $1,685,000 secured by a first deed of trust against the Property . . . due in no more than two years, which shall be recorded . . . simultaneously with the recording of the withdrawal of the Lis Pendens." Appellant and respondent had set $1.685 million for the amount of the note based on their updated calculation of appellant's half of their anticipated profit from an $8 million sale to Hadid; the profit had fallen since they began negotiations in September because their costs had risen in the intervening months. Concurrent with signing the final settlement agreement, respondent delivered his promissory note to appellant. The note stated "On or before March 1, 2009 or upon confirmation of recordation for sale of property . . . whichever occurs first . . . the undersigned promises to pay" $1,685,000. Respondent testified that the note did not provide for its immediate payment because the parties wanted to allow time to finish the project's construction. The parties calculated that a due date of about a year would give them sufficient time.

4

As promised under the settlement agreement, appellant gave respondent in conjunction with signing the settlement agreement appellant's withdrawal of his lis pendens on Jones's Cedarbrook property. But a few days later, respondent told appellant the sale to Hadid had collapsed because of the "access issue."[2] Asserting that payment of the note was contingent on selling the properties to Hadid, respondent did not pay the note on its stated due date of March 1, 2009.[3]

Based on respondent's failure to pay the note, appellant sued respondent for breach of the settlement agreement and promissory note. The court tried the case as a bench trial.[4] After appellant rested his case-in-chief, respondent moved for judgment under Code of Civil Procedure section 631.8. The court granted respondent's motion, finding respondent had not breached the settlement agreement and promissory note. In its statement of decision, the court found respondent more credible than appellant about "the intent of the parties and purposes of the settlement agreement and note." The court noted that "the condition upon or event which the settlement agreement was predicated upon, namely the sale of the property to Hadid, did not occur. Thus, the absence of the sale of the property to Hadid does not give rise to any obligation of [respondent] Wizman

---

[2]     Respondent asserts he did not know access problems would kill the sale to Hadid, but the court concluded otherwise. The court stated, "I can tell you that in terms of a mistake [by respondent], there was no mistake here. He knew about the landlock situation. He knew about the access problem. He thought there was a solution to it. So there's no mistake."

[3]     Respondent eventually sold Heather Court for $2.425 million in April 2011 to a buyer not involved in these proceedings. And in July 2011 respondent sold Arrowwood and a vacant parcel remaining from Heather Court to Hadid for $1.6 million. Claiming no profit from the sales, respondent never paid appellant any portion of the $1.685 million promissory note.

[4]     Appellant alleged his causes of action by way of a cross-complaint following respondent's earlier complaint against appellant that alleged multiple causes of action against appellant arising from the parties' dispute over the properties. On the eve of trial, respondent dismissed his complaint and the trial proceeded on only appellant's cross-complaint.

to pay [appellant] Elyakim the value of the note." The court found telling the silence of section 3.7 of the settlement agreement, which did not mention payment of the note if the sale did not occur. The court's statement of decision declared:

> The "only provision of the contract that addresses what should occur in the event the property is not sold to Hadid is section 3.7, which provides in full: 'If the property is not sold to the purchaser referred to in paragraph 3.5 [Hadid], then Wizman and Elyakim shall diligently attempt to sell the property. Any additional expenses incurred as of March 1, 2009 shall be deducted from both parties.' [¶] Provision 3.7 makes no reference or mention of the $1,685,000 unsecured note being paid or owed in the event the sale of the property is not made to Hadid. Therefore, once the sale of the property to Hadid was cancelled there could be no breach of the settlement agreement with regard to payment of the unsecured note, because the agreement did not contemplate or intend for payment of the unsecured note in the event the sale to Hadid was cancelled. If the unsecured note was to be paid after the cancellation of the sale to Hadid, the agreement should have expressly stated such or mentioned payment of the unsecured note after cancellation of the sale to Hadid."

> The court entered judgment for respondent. This appeal followed.

## DISCUSSION

Appellant relies on the seemingly plain language of the promissory note and settlement agreement to contend the court erred in finding respondent did not breach the promissory note when respondent did not pay it. Appellant contends the promissory note's explicit due date – "On or before March 1, 2009 or upon confirmation of recordation for sale of property . . . **whichever occurs first**" [emphasis added] – means the note was due no later than March 1, 2009, regardless of whether the sale to Hadid took place. And appellant notes that respondent testified that the settlement agreement – which created respondent's obligation to give appellant a promissory note due within no more than two years of their settlement (§ 3.3) – was the parties' complete and final

6

agreement. Respondent testified, "Q. The final version of the agreement was the final expression of your settlement in all respects with [appellant]? A. Correct. Q. The moment you said in your mind I have a complete and final deal with [appellant] was on January 23 when you guys both signed? A. Correct. Q. All the terms you wanted as part of the deal with [appellant] were in [the settlement agreement]? A. Correct." Slightly later in the trial, respondent reaffirmed his testimony: "Q. You thought it was the complete and entire agreement and expressed everything you meant to express in your final resolution with [appellant]? A. Correct."

Furthermore, appellant notes, respondent conceded under cross-examination that the language of section 3.3 of the settlement agreement requiring a promissory note with a due date of no more than two years after the signing of the settlement agreement – with which the promissory note's due date of March 1, 2009, complied – did not comport with respondent's interpretation that the note was unenforceable if the sale to Hadid did not take place. Respondent testified: "Q. [Section] 3.3 really should have said Wizman shall make and deliver a promissory note to Elyakim of $1.685 million only if the property sells and only if there's a profit? A. Only. Q. That's what the agreement should have said according to how you interpret it? A. That's how I interpreted the whole agreement. Q. You agree your interpretation is not what's – it's actually contrary to the language of the agreement, because the agreement says it's due in two years? A. If the house is sold." Respondent conceded his interpretation contradicted the note: "Q. I'm just asking just based on the language of the document. I want to know if you agree that the language of the note means even if the house is not sold, on March 1, the money would become due? A. Correct. Q. Your interpretation contradicts what the language says? A. Correct."[5]

_____

[5]  See *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1061 ["Parol evidence cannot be used to 'to flatly contradict the express terms of the agreement. Thus if the contract calls for the plaintiff to deliver to defendant 100 pencils by July 21, 1992, parol evidence is not admissible to show that when the parties said 'pencils' they really meant 'car batteries' or that when they said 'July 21, 1992' they really meant May 13, 2001."]

The promissory note and settlement agreement must be read together because the parties envisioned them as two parts of one overarching transaction. (Civ. Code, § 1642; Restatement Second, Contracts § 202, subd. (2); *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 713-714.) We conclude that, when viewed together as a whole, the settlement agreement and promissory note establish that payment of the promissory note was, as the trial court found, contingent upon a successful sale to Hadid. Accordingly, the trial court correctly found no breach in respondent's failure to pay the promissory note following the collapse of the sale to Hadid. In reaching this conclusion, we rely on several provisions of the settlement agreement, which create ambiguity as to what the parties intended if the sale to Hadid did not take place. We review as a question of law a finding of ambiguity. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) In the face of ambiguity, a court may admit parol evidence to interpret the contract. (*Adams v. MHC Colony Park* (2014) 224 Cal.App.4th 601, 620.) If the parol evidence involves disputed facts, the trier of fact – here the trial court – resolves those disputes. We review the court's resolution of those factual disputes for substantial evidence. (*Winet*, at p. 1166.) We now consider those various contractual provisions, which, taken as whole, establish ambiguity.

First, section 2.4 of the settlement agreement recited that the settlement agreement's purpose was to facilitate the sale of the property to Hadid, and that appellant and respondent would divide the sale proceeds. Section 2.4 stated: "Elyakim and Wizman desire to settle the Lawsuit, to acquire access across the Joneses' Property, to sell the Property, and divide the proceeds of the sale on the terms hereof." The provision thus anticipated a sale to Hadid, or else there would be no proceeds to divide.

Second, section 3.6 of the settlement agreement presupposed the source of funds that would be used to pay appellant was from the sale to Hadid: "From the proceeds of the sale, Elyakim shall receive the sum of $1,685,000."

8

Third, section 3.7(a)[6] discussed the parties' duties if the sale to Hadid did not occur.  It obligated the parties to "diligently" work to sell the property to a new buyer.  But instead of stating respondent's obligation to pay the note remained, section 3.7 did not mention the note, a silence emphasized by the trial court's statement of decision in which it observed section 3.7 was the only provision of the settlement agreement that discussed what happened if the sale to Hadid did not take place.

Fourth, section 3.7(b) indicated Hadid would provide a deed of trust to replace the deed of trust which respondent had given to appellant on respondent's home when respondent delivered his promissory note to appellant.  Hadid's offering of his deed of trust in substitution for respondent's deed of trust presupposed a successful sale to Hadid.

Because of the foregoing ambiguities in the settlement agreement as to what the parties intended if the sale to Hadid fell through, the court admitted parol evidence of the parties' settlement negotiations between their initial meeting in September 2007 to the signing of the agreement in January 2008.  The trial court found that throughout the negotiations, the parties contemplated each would receive a 50 percent share of the profits or losses realized from the sale of the properties.  According to respondent, and apparently accepted by the trial court, respondent's promissory note was merely an "accommodation" to reassure appellant that appellant's equitable claim to the properties and their attendant sale proceeds remained protected until Hadid delivered to appellant a deed of trust to secure Hadid's payment of the entire sales price, which he was going to pay in stages.  Section 3.5 of the settlement agreement described the sequence of Hadid's payments and issuance of a deed of trust for his purchase of the properties.  Hadid was to put up $2.6 million in cash and then, within six months of opening escrow, deliver two promissory notes, one of which was a note to appellant for $1.685 million that Hadid would pay.  Once Hadid issued his deed of trust, appellant was to reconvey to respondent the deed of trust on respondent's home.  According to respondent, appellant required the

_____

[6]     So numbered by the parties because the settlement agreement had two sections 3.7; therefore, they adopted the convention, which we follow, of referring to the first section 3.7 as "3.7(a)" and the second as "3.7(b)."

9

reassurance of the "accommodation" because appellant was not named on the title to the properties.

Appellant offers, however, a different interpretation of the effect of Hadid's note and deed of trust under respondent's accommodation theory. According to appellant, section 3.5 obligated Hadid upon escrow's close to tender a note by which he assumed respondent's obligation to pay appellant $1.685 million. That the payment obligation transferred from respondent to Hadid when, and if, Hadid bought the properties did not mean that respondent's duty to pay under respondent's note disappeared if the sale to Hadid did not happen. Be that as it may, appellant's interpretation of what the parties intended created a question of fact that the trial court resolved against appellant and in favor of respondent's accommodation theory. The court's statement of decision declared that "as a good faith measure to ensure that Elyakim would be entitled to his 50 [percent] share of the estimated profits from the anticipated sale to Hadid, Wizman offered to give a copy of a note and deed of trust on his own personal residence until escrow was open, at which time escrow instructions would require a replacement note in the exact same value to be issued pursuant to section 3.5."

Appellant contends that even if the court properly admitted parol evidence, the evidence showed that appellant did not want profit-sharing as found by the court, but wanted instead the promissory note's guarantee of payment. Appellant testified he wanted to protect himself from increasing construction costs eating into appellant's gains from the Heather Court and Arrowood properties. He testified his stated aim throughout the settlement negotiations was thus to get a fixed-payment not dependent on the sale to Hadid taking place.

Supporting appellant's contention, wording which could be construed as profit-sharing language was deleted from the final settlement agreement. Before its deletion, the relevant proposed language stated: "If the Property is not sold to the purchaser referred to in paragraph 3.5 [Hadid], then Wizman shall diligently attempt to sell the Property. If the eventual sale is for more than $8,000,000, then Elyakim's total share shall be $1,925,000 plus one half of the amount by which the sales price exceeds

10

$8,000,000. If the eventual sale is for less than $8,000,000, then Elyakim's total share shall be $1,925,000 minus one half of the amount by which the price is less than $8,000,000. The proceeds shall be divided as set forth in section 3.5, except that the amount of $1,925,000 in section 3.4.4 shall be replaced by Elyakim's share of the proceeds as adjusted by this section 3.6." But in the final agreement, the relevant provision stated: "If the Property is not sold to the purchaser referred to in paragraph 3.5 [Hadid], then Wizman and Elyakim shall diligently attempt to sell the Property. Any additional expenses incurred as of March 1 shall be deducted from both parties."[7] And in fact, respondent admitted under cross examination that because appellant no longer trusted respondent, appellant repeatedly asked during their settlement negotiations for a fixed payment not tied to respondent's expenses in finishing and maintaining the properties. Be that as it may, the settlement agreement's language was, when viewed as a whole, ambiguous as to what the parties intended if the sale to Hadid did not take place, making parol evidence admissible. And because substantial evidence supported the trial court's factual findings that respondent gave the promissory note to appellant as an accommodation that presupposed an $8 million sale of the properties to Hadid, the court reasonably found no breach from respondent's failure to pay the note when the sale to Hadid did not take place.

---

**7** For the reader's reference, we quote the pre-deleted language to which we have applied conventional proofreading marks to highlight the change in the wording: "If the Property is not sold to the purchaser referred to in paragraph 3.5 [Hadid], then Wizman and Elyakim shall diligently attempt to sell the Property. ~~If the eventual sale is for more than $8,000,000, then Elyakim's total share shall be $1,925,000 plus one half of the amount by which the sales price exceeds $8,000,000. If the eventual sale is for less than $8,000,000, then Elyakim's total share shall be $1,925,000 minus one half of the amount by which the price is less than $8,000,000. The proceeds shall be divided as set forth in section 3.5, except that the amount of $1,925,000 in section 3.4.4 shall be replaced by Elyakim's share of the proceeds as adjusted by this section 3.6."~~ Any additional expenses incurred as of March 1 shall be deducted from both parties."

## DISPOSITION

The judgment is affirmed.  Each side to bear its own costs on appeal.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, .J